## YOUNGSTOWN (city) v DeSALVO

Ohio Appeals, 7th Dist, Mahoning Co

No 2240.   Decided Oct 9, 1936

Wm. E. Lewis, Youngstown, for plaintiff in error.

Edward L. Williams, Youngstown, for defendant in error.

## OPINION

By NICHOLS, J.

Joe DeSalvo brought an action in the Court of Common Pleas of Mahoning County against the City of Youngstown to recover damages for injuries which he claims to have sustained by reason of being injured as a result of falling into an open manhole on Prospect Street in that city. An answer was filed denying the negligence of the city and pleading contributory negligence of the plaintiff. The case went to trial and resulted in a verdict in favor of the plaintiff for $750.00. Motion for a new trial was duly filed and overruled and judgment entered upon the verdict. Error is prosecuted from the judgment to this court. The parties are in inverse position to that in which they appeared in the court below.

The City of Youngstown, plaintiff in error, contends:

"First: That there is no evidence in the record showing that the city of Youngstown had either actual or constructive notice of the claimed defect in the street.

"Second: That the testimony of the plaintiff himself showed that he was guilty of contributory negligence, which should bar him from any recovery."

It is too well settled to need citation of authorities that before the city can be held liable for the alleged defect ▮▮▮ in the street it must have notice thereof, either actual or constructive. Was there a failure on the part of plaintiff to prove by the preponderating weight of the evidence that the City of Youngstown had either actual or constructive notice of the claimed defect? From an examination of the record it appears that Frank DeSalvo, a witness for plaintiff, testified as follows:

"Q. Now, I want you to tell in your own words to the jury, if you will, what you noticed prior to the day of the accident, the 25th of February, 1934, that is, before that time, what you noticed, if anything, unusual about this cover?

A. Well, I noticed that,—well long before my brother got hurt that manhole cover would jump up and down when a machine would pass over it, it was loose, and one day I went over and I fixed it myself, it was up about that high, sunk in.

Q. You say one day you went over to see it yourself, it was up about how high?

A. About that high.

Q. Indicating about a foot, 8 inches to a foot? Did you have occasion to put that back on there?

A. Yes sir.

Q. How high would this manhole cover jump when an automobile would go over it?

A. Oh, about a foot, foot and a half.

Q. How long had it been in that condition to your knowledge?

A. About a month."

The record further discloses that Jesse Bipps, a witness for plaintiff, testified as follows:

"Q. Where was the manhole cover located in the street; tell the jury, in the center of the street, or on either side?

A. It is kind of in the center I think.

Q. Now, before Mr. DeSalvo got hurt there had you ever noticed anything peculiar or unusual about that manhole cover, had you noticed anything about it?

A. When a machine would go across it, it would bounce up and down.

Q. How high would it bounce, how high have you noticed it bounce yourself?

A. Well, I heard the noise.

Q. How long had it been bouncing up and down in that manner, how long before that time had you noticed it?

A. Oh, about two, three weeks.
* * *

Q. For how long a period of time before that, before Mr. DeSalvo got hurt, had you noticed this manhole cover jumping up and down when cars would go over it?

A. Every time a machine would go over it I would see it bouncing.

Q. How long before that had you noticed it?

A. About 2, 3 weeks.

Q. Would it happen every time a car would go over it or not?

A. Every time a machine would go over it it bounced up.

Q Did you ever have occasion to put this manhole cover back on?

A. I put it on one time.

Q. Do you remember how long it was that you had put it back on before Mr. DeSalvo got hurt?

A. It was about maybe 2, 3 weeks I guess the time I put it on.

Q. Clear off then, was it?

A. Clear off."

Mike DeSalvo, another witness for the plaintiff, testified as follows:

"Q. Now, had you ever noticed anything peculiar about that manhole cover before your brother got hurt?

A. Yes, sir.

Q. Will you tell this jury what you noticed about it?

A. Well, every time a car would run over it it would make a noise, annoy you if you were sleeping like, and—

Q. Did you ever see the manhole cover move?

A. Yes, sir.

Q. When?

A. Well, one day there I was down in the cellar washing clothes and a fellow was looking for me, he was a tire salesman * * * just about that time a car came down and knocked that lid out, and I happened to look out and I seen that that lid was out and my hands were sort of wet and I told my brother Frank to go out there and put that lid on.

Q. That is the brother seated back there that just testified?

A. Yes, sir.

Q. Did he go out and put it on?

A. He went out right away and put it back on again.

Q. That is, when an automobile would

run over it, go over this cover it would jump out?

A. Yes, sir.

Q. Now, do you remember how long it was before your brother got hurt that that happened?

A. Yes sir, it was either the day before George Washington's birthday or George Washington's birthday, I don't remember exactly, either one of those days, either the 21st or the 22nd.

Q. Now, by the way, did you ever report the condition of this manhole to the city?

A. I reported once to a couple of fellows in a truck, but they told me it was none of their business,—to go down and report it to Westlake Crossing, down there, their office, or something down there, I don't know where it was.

Q. Were they street maintenance men, these truck men?

A. Yes, sir.

Q. Was anything ever done about it after you told them about the condition of that?

A. No, sir."

Felix Barrone, another witness for plaintiff, testified as follows:

"Q. Well, before the time he got hurt down there, on Prospect Street, did you ever see that manhole?

A. Yes sir.

Q. Did you ever notice anything peculiar about it?

A. I know the manhole, whenever automobile goes up, turn on one side; well, maybe the other automobile come down, go the other way, fix it up, that is all I know.

Q. When a man would go over it the manhole cover would go up and down?

A. Well, you know, turn; that is all I know.

Q. Did you ever see anybody put it back on?

A. I see colored fellow.

Q. How long had it been doing that, Mr. Barrone?

A. Well, I don't know a thing about it, maybe a couple of weeks, maybe for a month, I don't know anything about it because I didn't pay no attention; I have got enough of my own.

Q. Yes. But you had noticed what you have told us; you had seen this going up and down?

A. Yes sir. I saw that."

The above quoted testimony presented such a situation that the court properly submitted to the jury the question whether the city had actual or constructive notice of the defective condition of the street in question, and there is no complaint as to the charge of the court in its definition of constructive notice or of the duty of the plaintiff to show by the perponderance of the evidence that the city had notice, either actual or constructive. Viewing this evidence together with all the evidence in the record, we are unable to say that the verdict of the jury is manifestly against the weight of the evidence upon this subject.

The evidence discloses that the manhole in question was located approximately in the center of Prospect Street and approximately midway between two intersecting streets, and approximately in front of the home of the plaintiff. Prospect Street runs in substantially a northerly and southerly direction, plaintiff's home being on the east side of Prospect Street and about the middle of the block, the testimony showing that this block is somewhat longer than the ordinary city block; that on the night in question he was a passenger in an automobile driven by his friends; that this automobile entered Prospect Street from the northerly end and proceeded in a southerly direction until it got almost across from DeSalvo's house, where he told his friend to stop, and he got out of the automobile on the right or west side of the car and stood by the car until it had driven away. Instead of going upon the sidewalk on the west side of Prospect Street to one of the intersecting streets and there crossing over to the east side of Prospect Street and thence on the sidewalk to his home, the plaintiff upon alighting from the automobile started in a slightly diagonal direction on Prospect Street toward his home, and at this time fell into the manhole in question which then had no covering over it. There is no question but that the plaintiff received some injuries and no claim is made that the amount of the verdict is excessive. But it is the claim of counsel for the city that the plaintiff was guilty of contributory negligence because he did not walk from the automobile to the west side of the street and thence on the sidewalk to the intersecting street and cross at the intersection, and that he assumed the risks which lay in his path as he went diagonally across the street to his home from the point at which he had alighted from the automobile.

The city relies upon the case of **City of Dayton v Taylor's Admr., 62 Oh St 11.** The syllabus of that case reads as follows:

"A pedestrian who, without necessity and for his own pleasure and convenience, departs from the sidewalks and street crossings, upon which he would have avoided injury, and crosses a street intersection diagonally, and is injured by slipping into a catch-basin which lay between the crossings, must be held to have assumed the risks which lay in the path which he thus chooses."

The city contends that the principle set forth in the above syllabus in the case of City of Dayton v Taylor's Admr. is affirmed in the case of Village of Mineral City v Gilbow et, 81 Oh St 264, and also in the cases of Riding Academy v Miller, 127 Oh St 545, and Payne, Director General of Railroads v Gordon, 32 O.C.A. 565.

An examination of the facts in the case of City of Dayton v Taylor, Admr., supra, discloses that there was no negligence upon the part of the City of Dayton in the construction or maintenance of the catch basin into which Taylor slipped and fell due to the icy condition of the street. It must be remembered that §3714, GC, permits recovery against the city only in the event that it has failed to keep the street in repair and free from nuisance, and it is apparent that if there was no defect in either the street or the catch basin into which Taylor fell, there could be no recovery against the city of Dayton.

The facts in the case at bar are clearly distinguishable, and we think this distinction is clearly recognized in the case of Payne, Director General of Railroads v Gordon, supra, from which we quote the syllabus:

"A pedestrian who without any necessity and for his own convenience leaves the sidewalk at a railroad intersection and crosses the railroad crossing diagonally, and in so doing catches his foot in a hole in the roadway and is struck by a train and injured, can not be held to have assumed the risks of active negligence on the part of the railroad company which lay in the path that he thus chose. City of Dayton 'v Taylor, Admr., 62 Oh St 11, distinguished."

The motion to require the Court of Appeals of Montgomery County to certify its record in that case was overruled by the Supreme Court on May 24th, 1921. From the opinion, written by Ferneding, J., we quote:

"We think the syllabus and decision in the Taylor case should be limited to the facts of that case, and should not be extended to a case like the one at bar, where there was active negligence charged in the operation of a railroad engine over said crossing, and where there were unnecessary defects in the roadway. We approve the following propositions of the syllabus, and the reasoning of the court in support thereof, in the case of Durbin v Village of Napoleon, 21 C.C., 160:

" 'In passing over a street, at a point where no street crossing is provided, the pedestrian assumes the hazard of danger ordinarily present in a street kept in ordinary safe condition.

" 'He does not assume the risk of injury, without his fault, from unnecessary defects, or from obstructions and nuisances that are suffered to remain in the street, through the negligence of the municipal authorities.

" 'These propositions are not in conflict with the doctrine laid down by the Supreme Court in the case of the City of Dayton v Taylor's Admr., 62 Oh St 11, (43 W.L. B., 209)'."

See also Decker v Mitchell, 10 Oh Ap 438.

In the case now before this court the trial court properly charged the jury upon the subject of the contributory negligence of the plaintiff, and we are unable to find as a matter of law that the plaintiff was guilty of contributory negligence under the facts in this case, or that the verdict of the jury was manifestly against the weight of the evidence upon this subject.

We have considered all of the errors assigned and find no error in the record prejudicial to the rights of the City of Youngstown. The judgment of the Common Pleas Court must be and is, therefore, affirmed.

Judgment affirmed.

CARTER and ROBERTS, JJ, concur.